WILLIAM C. BEATIE, Respondent, v. ROCKY BRANCH COAL COMPANY, Appellant.

56  221
62  358,
56  221;
66  564

### Kansas City Court of Appeals, January 8 and 29, 1894.

1. **Landlord and Tenant**: CONSTRUCTION OF COAL LEASE. A lease for coal land contained a covenant that the lessee would, in mining said land, in all cases support the superincumbent bed of rock by sufficient props and stays. *Held*, said stipulation did not amount to a, representation and assurance by the lessor that there was such a bed of rock over the coal.

2. **Held, Further,** that said contract, summarized in the opinion, did not stipulate that the defendant should only be required to take out. coal where it could be done according to the "practiced or practicable, modes of mining."

3. **Held, Further,** that the contract was something more than the mere grant of a mining lease, but it was a renting agreement whereby the lessee acquired certain exclusive rights, and as it took possession of the land thereunder and used and retained the same, it cannot refuse to pay the agreed compensation; and even if the contract was procured. by fraud, of which there is no evidence, the lessee would have to. abandon the land and restore it to the lessor in order to rescind.

4. **Contracts**: LAW: CREATED DUTY: INEVITABLE ACCIDENT. When the law creates a duty and the party is disabled to perform it without any default in him and he has no remedy over, the law will excuse him, but when the party by his own contract creates a charge or duty upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable inecessity, because he might have provided against it by his contract.

*Appeal from the Lafayette Circuit Court.* — HON. RICHARD FIELD, Judge.

AFFIRMED.

· *J. D. Shewalter* for appellant.

(1) When the parties contract on the basis of the continued existence of a given thing (or its nonexist-

ence unknown to the parties), a condition is implied that if the performance is, or becomes, impossible from the perishing or nonexistence of the thing, that excuses performance. *Walker v. Tucker*, 70 Ill. 527, 543; 1 Chitty, Cont. [11 Am. Ed.], 1074; 10 Am. and Eng. Encyclopædia of Law, 181, title, Impossible Cont., par. 2. When a mine becomes exhausted according to the usual course of mining, or it has no existence, a contract to work it is void. *Cook v. Andrews*, 36 Ohio St. 174; *Brick Co. Pond*, 38 Ohio St. 65; *Walker v. Tucker*, 70 Ill. 527 on 543; *Clifford v. Watts*, 5 L. R. Com. P. [1st series], 576; Blanchard and Weeks, Mines and Mining [Ed. 1877], 428. (2) The two instructions for defendant, 2 and 3, the giving of which was the basis of the order granting a new trial, did nothing more, *i. e.*, they assert but the hypothetical question: Did the absence of head rock or the absence of coal, render the working of the mines impracticable by the usual methods? And it is always competent to show that mines cannot be worked by the usual methods; for instance, in the absence of head rock. *Walker v. Tucker*, 60 Ill. 527. (3) In the construction of a contract the intention of the parties, as gathered from the writing, will be sought; it will be construed as a whole, and a reasonable construction given to effectuate the intention of the parties. And it will be construed in the light of surrounding facts and most strongly against grantor. *Redheffer v. Lea*, 15 Mo. App. 12.

*Wallace & Chiles* and *Jno. S. Blackwell* for respondent.

Said instruction numbered two (2) is erroneous; said instruction numbered three (3) is erroneous. *Clark et al. v. Furnace Co.*, 21 Mo. App. 58. "There is

no implied warranty that the premises are fit for the use for which the lessee requires them. 1 Wash., Real Prop. [2 Ed.], side page 349, top page 358. Rent is the equivalent for the interest enjoyed or occupied. Taylor on Landlord and Tenant [6 Ed.], sec. 382. There is no implied covenant or warranty on the part of the lessor that the premises are tenantable. *Cleves v. Willoughby*, 7 Hill. 83; *Davis v. Smith*, 15 Mo. 467; Taylor on Landlord and Tenant, *supra; Fruin v. Railroad*, 89 Mo. 397; *Hunt v. Bailey*, 39 Mo. 257, at 276; *Spaulding v. Mumford*, 37 Mo. App. 281; *Burnes v. Fuchs*, 28 Mo. App. 279, at 281; *Rogan v. Dockery*, 23 Mo. App. 313, at p. 315, and cases there cited; *Ibid*, p. 316; *Dermott v. Jones*, 2 Wall, 1, at 7 and 8; *Peterson v. Smart*, 70 Mo. 34.

GILL, J.—This is an action for certain rents of mining land alleged to be due plaintiff Beatie by the defendant coal company, under the terms of a contract entered into by the parties in May, 1888. Beatie, it seems, owned an eighty acres of land in the vicinity of Higginsville, near to, if not adjoining, the line of the Chicago & Alton railroad, which defendant desired to mine. Defendant also had leases on other lands adjacent to that of Beatie, and which it desired to reach by railway switches or side tracks going from the Chicago & Alton road to such lands.

Thereupon Beatie and wife, as parties of the first part, and the coal company, as party of the second part, entered into a written contract substantially as follows: Beatie leased to the coal company for the term of twenty years, beginning November 1, 1888, "the coal mines and veins or strata of coal underlying" the eighty acres described, "with the exclusive right and privilege of mining, excavating, taking out and carrying away the stone coal within said mines and strata,"

etc. And Beatie did also further grant to the coal company for the said term of twenty years the right of way for a coal spur or switch which the coal company was to construct to connect with the Chicago & Alton railroad and which was to be fifty feet wide running through said eighty acres of land and along the line of the stream known as Rocky Branch; and Beatie as well granted to the coal company the right of way of like width for a spur or switch connecting with the main switch across plaintiff's land to the land of one McMeekin (which was also being mined by the coal company): "To have and to hold the mines and mining rights herein described, and the rights of way described and conveyed for and during the term of twenty years," etc.

In consideration of the premises the coal company agreed, on its part, to pay Beatie a half cent per bushel on the coal taken out, making payments at least as often as twice per month; and if at the end of the first year said royalty did not equal the sum of $300 then the coal company agreed to pay, in addition to such royalty, a further sum so as to make the amount of rent paid Beatie equal to $300 for said first year. The like payments were to be made the second year, except the amount to be paid Beatie should not be less than $400. And for the third and succeeding years of the lease the coal company agreed that the rent paid to Beatie should not be less than $600. It was, however, provided that these payments should cease "after the stone coal underlying said lands shall be fully taken and said mines entirely exhausted according to the practical methods of coal mining." It was further stipulated that the coal company would, as far as practicable, extract the coal by means of drifts and tunnels, and that these should be started within one hundred and fifty feet of the branch or ravine before mentioned,

and that, at all events, the defendant would not sink more than one shaft which should be contiguous to the right of way for said switch. And further it was agreed that it (the coal company) "will in mining said land in all cases support the superincumbent bed of rock by sufficient props and stays."

It was finally stipulated in the contract that if the coal company failed to pay as agreed and remained in default for the period of one year, then Beatie was authorized to re-enter the mines and resume possession of said rights of way and hold the same discharged of said lease.

By the terms of this contract it will be seen that the coal company was to pay to Beatie $300 during the first year, which ended November 1, 1889; $400 the second year, ending November 1, 1890; and $600 the third year, ending November 1, 1891. The defendant paid the $300 for the first year's rent, but declined to pay the $400 and $600 due respectively for the second and third years. For the enforcement of the payment of the two latter installments this suit was brought.

From the testimony it appears that the defendant entered upon the plaintiff's land at the time stipulated in the lease (November 1, 1889), sunk some pits or holes in searching for coal, and constructed the railroad switches, crossing plaintiff's land and over to that of McMeekin and others where the coal company operated mines. Some coal was taken out of Beatie's land, and it seems that on the line between Beatie's eighty and the McMeekin property a successful drift or tunnel was operated.

The defense rests substantially upon the claim that the coal underlying Beatie's land is so situated as not to be mined profitably according to the usual and ordinary course of coal mining. The specific defense

relied on was, that there was no superincumbent bed of rock forming a support for the coal there situated, and without this it "could not be extracted or mined by any of the practiced or practicable methods of coal mining."

At the trial below, among other instructions, the court, at defendant's instance, gave the following:

"2. By the contract read in evidence, the rights of the parties are subject to the restrictions and conditions therein contained. One of the conditions or requirements thereof is, that defendant will support the superincumbent bed of rock; that this provision is equivalent to a representation and assurance by plaintiff that there was such a bed of rock underlying said land, and if the jury should believe from the evidence that such a bed of rock is essential for the support of the earth in the working of the coal field, and if they should further believe from the evidence that in the absence of such rock any coal underlying any part of said land could not be worked by any of the practiced or practicable modes of mining, then, in the absence of such support of the earth above, defendant would not be required to mine any of the said coal or liable for any sum under the contract; and if the jury so believe, their finding will be for the defendant.

"3. The jury are instructed in the sinking or driving of entries, the defendant is limited, in opening or starting said entries into the bluff, to one hundred and fifty feet of the North Fork of the branch or ravine, and in sinking a shaft it must be adjacent to the right of way of the railroad; that under the contract it had no right to commence any of the said work at any other locality; that the contract is not a guarrantee on the part of the plaintiff that there was coal at either of these points, but it is an assurance upon his part of two things: *First,* that at these

locations there was a bed of supporting rocks; and, *second*, that there was under said land coal which was susceptible of being worked by, out or through, drifts or shafts started or sunk within said limits by the practiced or practicable mode of mining, and should the jury believe from the evidence that defendant made, thorough, tests within the said limits and found no overhead or supporting rock, and should the jury further believe from the evidence that there was coal under any part of the said lands, yet if they should further believe that in the absence of this head supporting rock the same could not be worked by any of the practiced or practicable modes of coal mining of a like vein or strata, then the defendant is nor required to go ahead and extend tunnels and drifts and support, in the absence of such rock, the entire weight of the earth by timbers or other braces, but they had a right to refuse to work the said mine, and in this event their finding will be for the defendant."

The jury under these and other instructions returned a verdict for defendant. But the court on plaintiff's motion set aside the verdict and granted a new trial, assigning as a reason therefor, the error in giving the above instructions. The defendant appealed.

I. That the circuit court committed error at the trial in giving defendant's instructions numbers 2 and 3 (and which we have quoted in the foregoing statement) is too plain for serious argument. It was then its duty to set aside the verdict based on such erroneous declarations of law, and grant the parties a new trial. It is this last action by the court, in sustaining plaintiff's motion for a new trial, we are called on to review. In this there was no error and we shall affirm the judgment.

The court's construction of the written contract, as declared to the jury in the foregoing instructions,

was clearly wrong, and finds no support on the face of the instrument. By these two instructions the jury was told that the plaintiff by said contract *represented* to, and *assured*, the defendant that all the coal underlying the leased land was supported by a superincumbent bed of rock. Notwithstanding all the verbosity and tedious repetitions with which the contract is burdened, there is no such "assurance" on the part of the plaintiff to be found. The only words contained in the instrument which can even give color to the claim of such a "*representation or assurance*" by the plaintiff are found in the covenant of the coal company "that it will in mining said land in all cases support the superincumbent bed of rock by sufficient props and stays." This amounted to no representation or assurance by the plaintiff that all the coal within the eighty acres of land was covered by beds of rock. It was only an agreement by the coal company that where such rock appeared it would be stayed or propped so as to prevent falling in and destroying the surface of the plaintiff's land.

Neither did the plaintiff by his contract stipulate that the defendant should only be required to take out the coal where it could be done according to the "*practiced* or *practicable* modes of mining." The undertaking of the coal company to extract the coal underlying plaintiff's land is not so modified by the terms of the contract. It is doubtless true, as testified by some of the expert miners, that it is more convenient and less expensive and perhaps according to the "*practiced mode*" to mine coal beneath what they term the "head rock covering" rather than to tunnel in and shore up the incumbent earth. But because the latter mode is more troublesome and attended with greater expense, defendant is not to be released from the plain terms of his contract. If defendant meant to

take out only that coal that was, or might be, covered by the roof of solid rock, it should have been so provided in the written agreement. The courts are authorized to construe the contract and declare its meaning, but neither court nor jury will undertake to vary, add to, or make a different agreement from, that the parties have made for themselves.

II. Since this case is to be tried again we deem it proper to remark that we fail to discover in this record any substantial defense to this suit. The contract between Beatie and the coal company is something more than the mere grant of a mining license. It was a renting agreement whereby the coal company acquired the right to use and occupy, to the exclusion of all others, certain lands belonging to Beatie. Rights of way fifty feet in width across plaintiff's land in addition to certain mining privileges were conveyed to the defendant; and it took possession of said rights of way, constructed thereon its railroad tracks and switches and, during the entire time the rents here sued for were accruing, and until this action was brought, the defendant held and used the same. On what principle, then, of law or right can the coal company be permitted to hold on to the land thus acquired under the contract and at the same time refuse to pay the compensation agreed therefor? There is no pretense that the defendant was induced to enter into the contract through any false and fraudulent representations made by the plaintiff. Indeed it would appear clear from the evidence that the defendant's officers and agents were as fully cognizant of the conditions of the underlying strata of coal, and the presence or absence of "head rock," as the plaintiff. It would seem that all had about the same actual knowledge or means of knowledge. Moreover, even if defendant was induced by the fraudulent practices of the plaintiff

to enter into this contract and acquire this land, yet it is a familiar principle that, to entitle the grantee to rescind, it must abandon the property acquired and make restoration to the grantor. The defendant cannot hold on to the land and at the same time declare a rescission of the contract; it cannot adopt the benefits arising from the agreement and at the same time repudiate its burdens.

That the coal in Beatie's land was so situated that it could not be extracted or mined except at unusual or extraordinary cost is, as we have already said, no excuse for the nonpayment of this rent. The defendant has, by its written contract, imposed on itself a duty from which the courts cannot and will not relieve it. "The distinction between a duty created by law, and one created by the party, is an established principle of our law. When the law creates a duty and the party is disabled to perform it without any default in him and he has no remedy over, the law will excuse him. But when the party by his own contract, creates a charge or duty upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract." *Davis v. Smith*, 15 Mo. 325; *Brinkerhoff v. Elliott*, 43 Mo. App. 185; *Clark v. Midland Blast Furnace Co.*, 21 Mo. App. 58.

The judgment of the circuit court awarding a new trial is affirmed. All concur.